# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 19, 2010

## DAVID M. OLVERA v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Davidson County
### No. 2003-A-390     Cheryl Blackburn, Judge

_____

### No. M2009-00039-CCA-R3-PC - Filed December 22, 2010

_____

Following a jury trial, the Petitioner, David M. Olvera, was convicted of first degree felony murder and especially aggravated robbery, a Class A felony. See Tenn. Code Ann. § 39-13-202(a)(2), -403(b). This Court affirmed his convictions on direct appeal. See State v. Olvera, No. M2004-02090-CCA-R3-CD, 2005 WL 3262932 (Tenn. Crim. App., Nashville, Dec. 2, 2005), perm. to appeal denied, (Tenn. May 1, 2006). The Petitioner filed a timely petition for post-conviction relief. After an evidentiary hearing, the post-conviction court denied relief, and this appeal followed. After our review, we affirm the post-conviction court's denial of relief.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

DAVID H. WELLES, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

David M. Olvera, Tiptonville, Tennessee, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual Background
### Trial

In the Petitioner's direct appeal, this Court summarized the underlying facts as follows:

Gladis Bastista Garcia, testifying through an interpreter, said that she had been married to the victim, Nemesio Silva, for ten years and the victim had lived in the United States for one year before he was killed. She denied knowing the [Petitioner] or the codefendant, Carlos Serrano.

Igmnicio Cruz Martinez, also testifying through an interpreter, said that he and the victim lived in the same apartment complex on Murfreesboro Road in Nashville and that the victim had purchased an automobile one month before he was killed.

Officer Garry J. James of the Metro Police Department testified that he was called to the crime scene off Culbertson Road on August 26, 2002, where he found the victim's body at the bottom of an embankment next to a creek. Officer James observed a bloody rock at the top of the hill directly above the victim's body, as well as several liquor bottles. He said the area where the victim's body was found was about three-quarters of a mile east of Nolensville Road.

Jorge Pastrana Hernandez, testifying through an interpreter, said that the [Petitioner] had lived with him and had introduced the codefendant, Carlos Serrano, to him. He said that on Sunday night, the [Petitioner], Serrano, and Mario Ramirez were drinking at his apartment and subsequently left in the [Petitioner]'s Mitsubishi Mirage automobile. Hernandez did not know what time the three men had returned, but they were at his apartment when he left for work the next morning around 6:40 or 7:00 a.m. and were still there when he arrived home from work that afternoon. He later saw Serrano cleaning out a red Nissan Pathfinder and throwing something into a garbage dumpster. Serrano subsequently left the apartment in the Pathfinder, followed by the [Petitioner] and Ramirez in the [Petitioner]'s car. When the [Petitioner] left, he took all of his belongings with him.

Yonas Altimimi, the owner of Lafayette Motors, testified that the [Petitioner] bought a Mitsubishi Mirage automobile from him in 2002 and in late August 2002, the [Petitioner] and two other men brought a Nissan Pathfinder to him to see if he would be interested in buying it. Of the three men, the [Petitioner] was the only one who spoke English. The [Petitioner] told him that Serrano wanted to sell the vehicle because he needed funds to go to Mexico. The men had a title to the vehicle, and Altimimi purchased it for $450. About two days later, the police confiscated the vehicle and title. Altimimi identified a photograph of Serrano as the man who sold him the

Nissan Pathfinder and acknowledged that the name on the title did not match any of the three men who brought the vehicle to him.

Kurt Walter Bartlett, a crime scene investigator for the Metro Police Department, testified that the crime scene appeared to be "a hangout for the locals where they would go and drink, maybe by the side of the creek, throw bottles into the creek." He said there was "quite a bit of debris" in the area which hampered his collection of the evidence. He said the victim was "covered in blood" and had "some distortion to his face because he had been laying [sic] there for quite a while." He took photographs of a rock that was covered in blood and made a diagram of the crime scene. He subsequently processed the Nissan Pathfinder and found latent fingerprints around the door, the hood area, and the rearview mirror.

Officer Thomas Simpkins of the Metro Police Department testified that he processed the evidence collected by Officer Bartlett, including a Boone's Farm bottle, on which he found some latent fingerprints, and a broken Chevas Regal bottle on which he noticed possible blood spots and two hairs.

Linda Wilson, a police identification analyst with the Metro Police Department, testified that she received the latent fingerprint lifts from Officers Bartlett and Simpkins and determined that prints from the driver's door of the vehicle matched Carlos Serrano.

Dr. Amy McMaster testified that she observed part of the autopsy performed on the victim by Dr. Thomas Deering. She said the victim had sustained multiple lacerations, contusions, and abrasions "all about the head and neck." In addition, he had several fractures of the upper and lower jaw which were comminuted, meaning that the bone was broken into many pieces, indicating "a very strong impact or a strong trauma." The victim also had a fracture along the base of the skull, which indicated blunt trauma to the skull; a large purple contusion on the left side of the face; and multiple small abrasions to the chest, abdomen, and legs. Asked which was the fatal injury, Dr. McMaster opined that it could have been the injury to the skull, which resulted in injury to the brain, or the fractures to the hyoid bone in the neck. She said both of these injuries were caused by blunt force trauma and were consistent with blows "from something hard like a bottle or a rock." The victim's toxicology report revealed .238% ethanol in his blood.

Detective Derry Baltimore of the Metro Police Department Murder Squad Unit testified that he interviewed the [Petitioner] on September 3, 2002, through Detective Marvin Rivera who spoke Spanish. The [Petitioner] came to the police station voluntarily and was not under arrest. The interview was videotaped, and the tape was admitted into evidence with a small portion of it being played for the jury. The interview was subsequently transcribed in English, and both parties stipulated as to the accuracy of the transcript. Detective Baltimore, along with Detective Rivera and Harold Donnelly from the district attorney general's office, then read the transcript into evidence.

During his interview, the [Petitioner] said that he, Serrano, and Ramirez left Franklin on a Sunday and drove to the Executive House Apartments in Nashville, arriving around 10:00 p.m. The [Petitioner] waited in the car while Serrano and Ramirez went to look for someone. When Serrano and Ramirez returned, the victim approached and asked Serrano if he would take him to buy some beer because he did not know how to drive a standard shift automobile. Serrano then left with the victim in the victim's vehicle, and Ramirez got in the [Petitioner]'s car. When the victim and Serrano returned, Serrano got in the car with the [Petitioner] and Ramirez and told Ramirez that he had seen the title to the victim's vehicle. Ramirez then said, "Let's rob him" and asked the [Petitioner] if he wanted to participate. The [Petitioner] initially said "no," but, after much nagging and chastising, Ramirez convinced the [Petitioner] to participate in the robbery. Serrano and Ramirez got out of the [Petitioner]'s car and invited the victim to drink with them in the car. The four men then left the apartment complex and drove to Nolensville Road where they stopped at a gas station to purchase beer. They later stopped on Overton Road where Serrano, Ramirez, and the victim got out to urinate while the [Petitioner] remained in the car. The [Petitioner] then saw Ramirez hit the victim in the head several times with a "big bottle." The [Petitioner] got out of the car and told Ramirez to stop hitting the victim, but Ramirez refused. Serrano also told Ramirez not to hit the victim any more, saying, "[Y]ou're going to kill him." Ramirez then said he was going to "shove" the victim into the river and proceeded to push the victim down the embankment. Not wanting to get involved, the [Petitioner] returned to his car. Serrano and Ramirez subsequently walked up from the river bank, and the [Petitioner] drove them to the Executive House Apartments where the victim's vehicle was located. All three men then returned to Franklin, with Serrano driving the victim's vehicle and Ramirez and the [Petitioner] traveling in the [Petitioner]'s car. After selling the victim's vehicle to a dealership for $450, they went to Pennsylvania.

Heather Aguirre testified that, in 2002, the [Petitioner] and Serrano lived with her at the Heritage Place Apartments in Franklin. During that time, the [Petitioner] worked long hours six to seven days a week. She rarely saw the [Petitioner] drink alcohol, but Serrano drank "a lot" and "always wanted to go out and party." She had seen Ramirez on two occasions.

Aguirre said the [Petitioner], Serrano, and Ramirez came to her apartment on the morning of August 26, 2002, and she saw a Nissan Pathfinder parked in front of the apartment. Serrano told her he had bought the Pathfinder, showed her the registration, and claimed ownership. She said the [Petitioner] told her good-bye and to take care of her children, and the three men then left for Pennsylvania. Subsequently, she talked to the [Petitioner] by telephone and convinced him to return to Franklin because the police wanted to question him.

The twenty-one-year-old [Petitioner] testified that he was a native of Mexico and had been living in the United States for about four years. He said he had a third grade education and had worked as a painter. The [Petitioner] said when he arrived home from work around 5:00 or 6:00 p.m. on August 25, 2002, Serrano and Ramirez were there drinking tequila. At their request, the [Petitioner] drove Serrano and Ramirez to Nashville "to look for a friend at the Executive [House Apartments] so they could drink beer." Serrano and Ramirez could not locate their friend, but Serrano talked to the victim and then drove the victim to a gas station to buy beer because the victim did not know how to drive a standard shift car. When Serrano and the victim returned, Serrano told the [Petitioner] and Ramirez they should steal the victim's vehicle because he had seen the title to it. Ramirez agreed, but the [Petitioner] told them he did not want to participate. Ramirez and Serrano told the [Petitioner] that he "wasn't acting like a Mexican," and Ramirez told him if he did not participate, he would be the one they attacked. The [Petitioner] said he felt threatened because Ramirez was sitting in the front seat of his vehicle with a bottle of tequila in his hand. Serrano then located the victim, who was drunk, and persuaded him to get in the car with them to go "drinking" and "looking for women." The four men then left the apartment complex, with the [Petitioner] driving. After stopping at a gas station to purchase beer, they continued driving and did not stop again until Ramirez told the [Petitioner] he needed to urinate. Ramirez, Serrano, and the victim then got out, and Ramirez ordered the [Petitioner] out of the car. While the victim was urinating, Ramirez came up behind him and "hit him at the nape of the neck with a bottle of the tequila" several times. When Serrano saw the victim on the ground, he

-5-

"started to kick him in the ribs." The [Petitioner] described what happened next:

> I walked toward my car when [Ramirez and Serrano] each grabbed [the victim], each one with one leg and one hand and pushed him down an embankment. And I got into my car but I was shaking. I didn't know what to do. I kept stepping on the gas and stepping on it and the car was on, it was running. And I tried to get it to move but it wouldn't move.

> . . . .

> I saw how they hit him and I saw how they were kicking [the victim] and I thought that I was going to be the next.

The [Petitioner] said Ramirez and Serrano then jumped in the car, and Ramirez told the [Petitioner], "[Y]ou were trying to leave us, weren't you[?] . . . [L]et me make this clear to you, you shit head, this was no game." The three men returned to the Executive House Apartments where Serrano got in the victim's vehicle and then drove it to the apartment in Franklin. The [Petitioner] and Ramirez drove to the Franklin apartment in the [Petitioner]'s car. The next day, the three men went to Altimimi's dealership and sold the vehicle for $450, with Serrano receiving the money. The [Petitioner] acknowledged that he was the one who spoke to Altimimi because Ramirez and Serrano could not speak English. The [Petitioner] said that Ramirez later took the money from Serrano and that he did not receive any of the money.

After they left the dealership, Ramirez told Serrano and the [Petitioner] that he could get them jobs in Pennsylvania. When the [Petitioner] said he "wasn't going anywhere because . . . [he] hadn't done anything," Ramirez told him that all three of them "were involved in this and that . . . if he got put in the jail that [the Petitioner] was going in too. And that if not, then he would find [the Petitioner] and he would hurt [the Petitioner]." The three men later drove to Pennsylvania in the [Petitioner]'s car, and, en route, Serrano and Ramirez told the [Petitioner] "about how they had beaten [the victim]. They were just kidding around about it."

After staying in Pennsylvania for about a week, Ramirez left for Mexico and the [Petitioner] called Heather Aguirre to explain "what was going on." Aguirre told him that detectives wanted to speak to him. The [Petitioner]

and Serrano subsequently drove back to Franklin, during which time Serrano told the [Petitioner] to be "very careful" about what he told the police and "to not say that [Serrano] . . . had picked [the victim] up . . . and thrown him." Serrano also told the [Petitioner] not to tell "about the way that [Ramirez and Serrano] had treated [him] because if [Serrano] were to be put in jail, he was going to make sure that [the Petitioner] got put in jail too. And that if they didn't catch [the Petitioner] then Ramirez had already told [the Petitioner] what they were going to do to [him]." The [Petitioner] said he took Serrano's threats seriously because he had seen "with [his] own eyes how they kicked [the victim]."

The [Petitioner] then read into evidence a two-page, bloodstained letter which he received from Serrano after they were incarcerated:

> I know that you didn't say anything. You're the only one that knows what I did and if you say something, I'm going to kill you as I do with the other one—as I did with the other dude on the street. I'm going to cut your throat one side to the other. Keep your mouth shut and accept whatever comes.
>
> . . . .
>
> It's blood inside and blood outside . . . if you say something about what I did about what happened, you're a dead man. You're living here with me and you know what could happen if you tell the truth about what I did. I'm going to make sure that you never wake up . . . .

On cross-examination, the [Petitioner] maintained that he had no choice but to participate in the robbery of the victim because Ramirez and Serrano were in his car, "[o]ne of them beside me, one of them behind me giving me orders, turn here, turn there." He acknowledged that when he gave his statement he did not tell the police that he had been coerced by Ramirez because he was "very nervous" and thought he "would be the next one they would kill." The [Petitioner] said that he went to Florida after Serrano was arrested and that he was living in Ohio at the time of his arrest.

Sergeant Johnny L. Hunter of the Metro Police Department, who was accepted by the trial court as an expert in handwriting analysis, identified a letter written in Spanish that he received for handwriting comparison with the

[Petitioner]'s and Serrano's handwriting samples. He was also asked to perform a blood test to determine if the red substance on the letter was indeed blood. Sergeant Hunter opined that the letter was written by Serrano and said that the red substance tested positive for blood.

Mainor Patricio Salas, testifying through an interpreter, said that he was currently incarcerated for aggravated robbery and had met the [Petitioner] and Serrano in prison. He said Serrano had confessed to him "what they had done." He said that although Serrano had not given him a name, he told him "they had stolen a car and they had killed the owner of the car." Serrano told him that Ramirez had hit the victim on the head with a bottle and that Serrano had kicked the victim when he fell to the ground. Serrano also told him that the [Petitioner] "was on the other side" and did not do anything to the victim.

See State v. Olvera, No. M2004-02090-CCA-R3-CD, 2005 WL 3262932, at *1-6 (Tenn. Crim. App., Nashville, Dec. 2, 2005), perm. to appeal denied, (Tenn. May 1, 2006).

Post-Conviction Hearing

On December 6, 2006, the Petitioner filed a petition for post-conviction relief asserting that: (1) his conviction was based on the use of a coerced confession; (2) his conviction was based on a violation of the privilege against self-incrimination; (3) his conviction was based on a grand or petit jury that was unconstitutionally selected and impaneled; and (4) he was denied effective assistance of counsel. On August 16, 2007, his court-appointed, post-conviction counsel filed an amended petition alleging that the Petitioner's trial counsel was ineffective because: (1) he failed to obtain a psychiatric expert to determine if the Petitioner had the ability to differentiate between involuntary and voluntary detention; (2) he failed to present relevant defense witnesses; and (3) he failed to address the language barrier between the parties, resulting in the Petitioner not being able to meaningfully assist in his own defense.

On October 24, 2007, the post-conviction court conducted a hearing regarding the Petitioner's claims. The Petitioner testified that his trial counsel visited him while he was incarcerated and that they also corresponded by mail. The Petitioner also recalled that he spoke to his trial counsel on the telephone while he was in jail. He testified that he thought his trial counsel should have retained a psychiatric expert to testify about whether his statement to police was voluntary because, at the time he made his statement, he felt "pressured and a little threatened by [co-defendant] Carlos Serrano." Then, the Petitioner informed the post-conviction court that he did not want to continue testifying because he was not pleased with his post-conviction counsel's investigation of his case. However, despite

-8-

the fact that the post-conviction court warned the Petitioner that this was his only opportunity to be heard, the Petitioner refused to testify and asked to be removed from the witness stand. Post-conviction counsel then questioned the Petitioner's trial counsel.

Trial Counsel testified that he had been practicing law for seventeen years and worked 241.6 hours on the Petitioner's case. He stated that he met with the Petitioner twenty times and that he did not believe the Petitioner needed a psychological evaluation. He added, "He was very normal. He assisted me a lot. He was quite helpful in the defense, preparing for trial." He stated that he did not hire an expert to determine whether the Petitioner's statement to police was voluntary and explained,

> I didn't think it was necessary. [The Petitioner] is very streetwise. He is a very bright individual. He speaks English quite well, although he would try to lead this court to believe he doesn't. He speaks English better than about ninety-nine percent of my native English speaking clients. He knew what he was doing.

Trial Counsel also testified that he had the assistance of an investigator and an interpreter when preparing for the Petitioner's trial. He elaborated:

> I used an interpreter the first meeting we had, which lasted 4.9 hours. And [the Petitioner] did speak Spanish at that meeting. Halfway through the meeting he suddenly started speaking English, and we just were shocked. And I asked him in the middle of the meeting, I said, you speak English. He said, yeah, I speak English. I said, why didn't you tell us. He said, why didn't you ask me. He said, I'm bilingual, I speak very good English as you can tell. After that time I asked him, do you want me to keep bringing back an interpreter, it's no problem. He said, there's really no reason to bring an interpreter back because I speak good English.

Trial Counsel recalled that "several times" he watched a video that showed the Petitioner's co-defendant Carlos Serrano at the crime scene with police. Regarding the contents of the video, Trial Counsel testified that Mr. Serrano "denied doing anything. He took no responsibility, and [the Petitioner] covered up for him. So would it have helped us? No, it wouldn't have helped us a bit because Mr. Serrano denied doing everything. And [the Petitioner] agreed to help lie. He agreed to cover up for him." Trial Counsel also testified that, even if he had wanted to introduce the video of Mr. Serrano into evidence, he did not think it would be admissible.

The post-conviction court denied the Petitioner relief in a twenty-two page written order filed January 17, 2008.

**Analysis**

**I. Full and Fair Hearing**

In his brief, the Petitioner states that he wanted his post-conviction counsel to present a videotape that showed his co-defendant, Carlos Serrano, reenacting events that occurred at the crime scene. The Petitioner claims that the video shows that he "had no involvement in the offense." The gravamen of the first two issues[1] that the Petitioner presents for review is that he did not receive a full and fair post-conviction hearing because his post-conviction counsel did not present the videotape as evidence and because the post-conviction court "refused to address" the matter. However, after our review, we conclude that the Petitioner did receive a full and fair hearing and that the issues he raises are without merit.

It is settled law that there is no constitutional right to counsel in post-conviction cases and, therefore, "no constitutional right to effective assistance of counsel in post-conviction proceedings." House v. State, 911 S.W.2d 705, 712 (Tenn. 1995). "All that due process requires in the post-conviction setting is that the defendant have 'the *opportunity* to be heard at a meaningful time and in a meaningful manner.'" Stokes v. State, 146 S.W.3d 56, 61 (Tenn. 2004) (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976)) (emphasis in original). In House, the petitioner argued that he was deprived of a full and fair hearing because his post-conviction counsel only introduced the trial record and did not present any other evidence. 911 S.W.2d at 707. However, our supreme court disagreed and stated that because the petitioner was "given the opportunity to present proof and argument on the petition for post-conviction relief," he received a full and fair hearing. Id. at 714.

In the instant case, the Petitioner was given an opportunity to present proof and an argument during his post-conviction hearing on October 24, 2007. The Petitioner began to testify at his post-conviction hearing, however, shortly after he started, he told the post-conviction court that he did not want to continue. The Petitioner claimed that his post-

---

[1] In his brief, the Petitioner states the first two issues he presents for review as follows:
I. Whether the post conviction court abused its discretion when it purposefully and intentionally refused to address or acknowledge the fact that post conviction counsel . . . refused to present crucial evidence in support of Petitioner[']s claim of ineffective assistance of counsel?
II. Whether the [post-conviction] court abused its discretion and made an erroneous finding of fact, when it concluded in effect that Petitioner could be afforded a meaningful opportunity to be heard and present evidence, while intentionally preventing petitioner from being able to support his testimony with concrete evidence.

conviction counsel did not do a proper investigation and that, because the Petitioner's testimony would be the only proof, continuing with the hearing would be a waste of the court's time. The post-conviction court told the Petitioner, multiple times, that it needed to hear what he had to say about his claims that his trial counsel was ineffective and that after it heard his testimony, it would decide if a continuation was necessary. However, despite the fact that the post-conviction court warned the Petitioner that this was his only opportunity to be heard, he refused to testify and asked to be removed from the witness stand. Post-conviction counsel then questioned the Petitioner's trial counsel. After reviewing the record, we conclude that the Petitioner had a full and fair hearing because he was "given the opportunity to present proof and argument on the petition for post-conviction relief." See House, 911 S.W.2d at 714.

## II. Accuracy of Post-Conviction Hearing Transcript

The Petitioner testified in Spanish and utilized a translator during the hearing. The Petitioner contends that the post-conviction court "abused [its] discretion by failing to ensure that the record adequately reflected proper translations which accurately reflected the true nature and substance of the testimony and statements made during the hearing."

In his brief, the Petitioner alleges that there are fifteen discrepancies between what he said and what was translated and transcribed. However, "[a] defendant contending that a translation was inaccurate must prove prejudice, and this [C]ourt will not speculate about the accuracy of the translation." State v. Jermaine Hughey, No. W2004-01074-CCA-R3-CD, 2006 WL 2000734, at *10 (Tenn. Crim. App., Jackson, July 18, 2006). The Petitioner has failed to prove prejudice because all that we are presented with are his uncorroborated allegations.

Moreover, the proof presented at the hearing indicated that the Petitioner spoke English well and could have objected had he noticed the interpreter was translating his testimony incorrectly. One of the issues that the Petitioner presented in his amended petition for post-conviction relief was that he had "extremely limited English skills and that [his trial counsel] failed to obtain the services of a [c]ourt approved translator during their discussions." However, in its written order denying the Petitioner relief, the post-conviction court stated that it deemed Trial Counsel's testimony credible and summarized his testimony as follows:

> Trial [C]ounsel testified that he [w]as appointed to represent Petitioner at his first appearance in Criminal Court. Trial [C]ounsel requested funds for an investigator as well as an interpreter. At their first meeting, [T]rial [C]ounsel brought an interpreter with him. Trial [C]ounsel testified that half-way through the 4.9 hour interview, Petitioner stopped speaking Spanish and

-11-

began speaking English, which [T]rial [C]ounsel stated shocked both him and the interpreter. Trial [C]ounsel said he asked Petitioner if he should keep bringing back the interpreter for meetings, and Petitioner indicated there was no need to do so since he spoke English.

. . . .

Trial [C]ounsel testified that he met with Petitioner approximately twenty times over the course of his representation and that they had no difficulty communicating. He also noted they spoke over the phone and that Petitioner had called [T]rial [C]ounsel at his office approximately nine times. To corroborate his testimony and demonstrate Petitioner's understanding of the English language, [T]rial [C]ounsel provided the [c]ourt with numerous letters and written correspondence, which were admitted as Exhibits 2-13.

Trial Counsel also testified that the Petitioner "speaks English quite well. . . . He speaks English better than about ninety-nine percent of my native English speaking clients." We note that at no time during the hearing did the Petitioner object to the interpreter's translation, nor did he otherwise indicate that his testimony was being translated improperly.

Finally, the Petitioner claims that he once asked to testify, but that his request is not reflected in the record. The post-conviction court noted that, during Trial Counsel's testimony, the Petitioner asked for a comfort break, which it granted. The post-conviction court stated, on the record, that the Petitioner then refused to return to the courtroom, and that the court ordered the Department of Correction officials to bring him back in. After this incident, the post-conviction transcript reflects that the Petitioner said, "I'm sorry." However, the Petitioner claims that he said as follows:

I'm being unfairly treated by this [c]ourt. Why did the guards have to wrestle with me to bring me back here to sit like an idiot. Why don't you let me have the tape to prove my case. Or at least let me testify about the tape then you order an [sic] continuation.

The record does not support the Petitioner's contention that he was denied an opportunity to testify at his post-conviction hearing. When the Petitioner was on the witness stand and refused to testify, the following exchanges occurred between him and the post-conviction court:

[The Petitioner]: I don't want to continue.

-12-

[The Post-Conviction Court]: Well, you're going to continue, Mr. Olvera, or you're going to forfeit your right to go forward. . . .

[The Petitioner]: This is ridiculous for me. I'm not going to continue. I ask you to forgive me, but I don't want to waste your time.

[The Post-Conviction Court]: Well, Mr. Olvera, if you don't answer the questions, we're going to go forward with this hearing. If you don't answer the questions, we're having a hearing. It's been going on for some period of time. If you don't answer the questions and you give up your rights to this hearing, you'll never be able to address any issue again.

Mr. Olvera, if it's necessary to continue it for certain things, I will continue that at the time. But right now I want to know what your allegations are that [Trial Counsel] did not do.

. . . .

[The Petitioner]: I already said I'm not going to continue. I'm not waiving my rights.

[The Post-Conviction Court]: Well, if you don't answer your questions, you will be waiving your rights.

. . . .

[The Post-Conviction Court]: Mr. Olvera, this is what your choice is right now. [Post-conviction counsel] is going to ask you questions. You are to answer the questions. If you don't answer the questions, we're excusing you as a witness and we will go forward otherwise.

. . . .

[The Petitioner]: I apologize, but I would rather be excused.

[The Post-Conviction Court]: Well, all I can tell you, Mr. Olvera, is that if you don't participate in this, I will make a decision based on the information I do hear. If you don't want to answer, then that's fine.

. . . .

[The Post-Conviction Court]: Well, you know, I'm not continuing this. I want to hear some of the allegations that you have that [Trial Counsel] didn't do a good job. And you can testify to that today or not. But if you don't, then I have no grounds to consider this. . . . So do you want to talk about those issues or not?

[The Petitioner]: Not at this moment because—

[The Post-Conviction Court]: Okay. This is your only moment to talk about it.

[The Petitioner]: But it's just going to be my word, nothing else.

[The Post-Conviction Court]: Well, but that's still—I want to hear what you have to say about that. And then we can decide whether there's some other witnesses. But I want to hear what you have to say. But if you don't testify, there's no evidence of anything. Your choice.

. . . .

[Post-conviction counsel]'s going to ask you a question, and you can answer the question. If you choose not to, then we're going to have you step down. And you will have waived your opportunity to tell me what you meant by these allegations.

. . . .

[The Petitioner]: I prefer to go back.

Also, at the end of the post-conviction hearing, the post-conviction court stated, "I do not understand why he chose not to testify because it's very important to have the factual allegations in the record. But he chose not to do so even after having been advised by me many times to do so." Thus, we conclude that this issue is without merit because the Petitioner has not shown that the record contains an incorrect translation of his testimony nor that he was prejudiced by an inaccuracy.

### III. Waiver

In its order denying relief, the post-conviction court wrote, "Petitioner, with the assistance of an interpreter, refused to testify as to any issues raised in his amended petition. Thus, the [c]ourt finds that Petitioner has waived his claim and denies his request for post-

-14-

conviction relief as to this issue."  The Petitioner asserts that the post-conviction court "abused its discretion and made an erroneous finding of fact" when it concluded that the Petitioner had waived the issues presented in his post-conviction petition by refusing to testify.

However, as the post-conviction court correctly noted, the Post-Conviction Procedure Act states that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented."  Tenn. Code Ann. § 40-30-106(g).  We also note that, although the post-conviction court found that waiver existed, before denying relief, the court also discussed the proof presented at the hearing and examined the merits of the Petitioner's arguments.  Thus, the Petitioner is not entitled to relief on this issue.

## IV.  Writ of Error Coram Nobis

In his brief appealing the denial of post-conviction relief, the Petitioner argues that the trial court erred by denying his writ of error coram nobis.  However, because the denial of the writ of error coram nobis is not properly before this Court, the Petitioner is not entitled to relief on this issue.

## V.  Federal Law

Finally, the Petitioner asserts that the post-conviction "court abused its discretion and made erroneous findings of fact, that were clearly an unreasonable decision in light of clearly established federal law."  In his brief, he claims that his constitutional rights were violated because the post-conviction court failed to honor his rights to effective assistance of counsel and a full and fair hearing.  As we have already discussed, the Petitioner did not present any proof that his trial counsel was ineffective.  In our view, the post-conviction court properly denied relief.  We also conclude that the Petitioner was not denied a full and fair hearing. The Petitioner is not entitled to relief on this issue.

### Conclusion

Based on the foregoing authorities and reasoning, we affirm the judgment denying post-conviction relief.


_____
DAVID H. WELLES, JUDGE

-15-